# Exhibit G

STATE OF ILLINOIS )
) SS
COUNTY OF LAKE )

F I L E D

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

DEC 1 8 2020

Erin Cartwright Weinstein
CIRCUIT CLERK

THE PEOPLE OF THE STATE OF ILLINOIS )
)
v. ) 20 CF 1133
)
VINCENT YORK )
)

### ORDER

This matter comes before the court on Defendant's motion to dismiss the July 2020 grand jury indictment charging him with the offense of first degree murder. Having reviewed the record, statutory authority and case law, and being fully advised, the court now grants Defendant's motion for the reasons that follow:

### I. BACKGROUND

This case has been presented to a grand jury on three separate occasions, with each grand jury reaching different conclusions. The charges all allege that on September 14, 2019, Defendant fatally struck Brian Wilson with his vehicle.

THE OCTOBER AND NOVEMBER 2019 GRAND JURY PRESENTATIONS

The State first presented the case to the grand jury on October 16, 2019, and then again a few weeks later to the same grand jury on November 13, 2019. The evidence presented at those two sessions was essentially the same as pertinent to this motion—indeed, the record from the November 2019 session reflects that the grand jury was provided with and reviewed the transcripts from the October presentation of evidence. At both sittings, the State called North

Chicago Police Detective Jose Sarabia as its witness. In November, Sarabia specifically testified that he reviewed the October transcript of his testimony and that it was correct other than the additional information to which he testified in November.

In sum, Sarabia testified that Defendant arranged to meet his estranged wife, Laquitta, at a North Chicago gas station to discuss an earlier altercation. When Laquitta and her boyfriend Brian Wilson arrived, the arguing continued. Laquitta moved her car to a nearby alley and Wilson exited the vehicle. At this point, surveillance video indicates a gun was fired near the car. An eyewitness informed police that Wilson fired a shot into the air. Wilson then entered the street on foot, where Defendant's vehicle circled Wilson multiple times. The surveillance video showed Wilson in a shooting position and a second eyewitness told police that Wilson shot at Defendant's car. The eyewitnesses stated that Defendant then struck Wilson once with his car and drove away.

Defendant told police that he lost control of his car as he was being shot at. One shell casing was found at the scene of the incident, and Defendant's car had no bullet holes. No gun was discovered. An eyewitness saw Laquitta remove a gun from Wilson after he was hit. A presumptive test during the autopsy showed gunshot residue on Wilson's hands and face.

Toward the end of the October 2019 grand jury hearing, a grand juror asked:

Q: Okay. So this is just about what we're supposed to determine because it has no bearing if it was self-defense or anything else. He killed the guy and he left and she concealed the gun. Those are the only facts we need to look at, is that correct?

The Assistant State's Attorney replied, "[c]orrect." *Report of Proceedings (ROP), October 16, 2019*, p. 16.

2

The State did not present any evidence to the October 2019 grand jury that Defendant had contacted 911. The October 2019 grand jury indicted Defendant for the offense of leaving the scene of an accident involving death or personal injury (625 ILCS 5/11-401(b)).

Investigators subsequently located records that Defendant did call 911—the call had been routed to a neighboring police department. On November 13, 2019, the State again appeared before the grand jury. The prosecutor first made a record that the October 2019 transcripts had been tendered to and reviewed by the grand jury. Detective Sarabia then testified that his earlier testimony was correct except regarding a 911 call. The majority of Sarabia's November testimony then focuses on the discovery that Defendant called 911 following this incident. Sarabia specifically testified that, in Defendant's call to 911, he told the operator that he was defending himself because the victim shot at him twice. The grand jury then purported to return a "no true bill". Later that day, after the court questioned whether the grand jury had the authority to recall an indictment (see generally 82 A.L.R. 1057 (grand jury, after it returns an indictment, retains no power to subsequently reconsider and withdraw it)), the State moved to *nolle prosequi* the indictment against Defendant charging leaving the scene of an accident involving death or personal injury.

THE JULY 2020 GRAND JURY PRESENTATION

On July 22, 2020, the State presented this case to the grand jury for the third time. Once again, Detective Sarabia testified regarding Wilson's death.[1] Sarabia began by testifying that Defendant's vehicle circled Wilson multiple times and that Wilson's body came to rest on the west side of Jackson in an alley.

---

[1] The July 2020 grand jury transcript identifies the date of the incident as "September 14 of 2020" (*Report of Proceedings, July 20, 2019*, p. 3) whereas the 2019 transcripts both state the incident occurred September 14, 2019. *Report of Proceedings, October 16, 2019*, p. 3; *Report of Proceedings, November 13, 2019*, p. 3). Viewed in context, it seems clear this was a simple misstatement.

3

The Assistant State's Attorney then stated, "[s]o I'm going to play the WGN News clip," and the transcript indicates that the recording was played. *ROP, July 22, 2020*, p. 6. The transcript contains nothing further about this news clip or its contents.

As part of the hearing on Defendant's motion to dismiss, this court reviewed the WGN recording. It is a news story about the incident primarily recorded at the scene of Wilson's death the day after it occurred. The story shows members of Wilson's family, describing him as a "protector" with the "biggest" and a "beautiful" heart. The reporter highlights the "brutal way Wilson was murdered" with Wilson's mother stating Defendant "ran over my son like a dog". The news clip also includes Laquita, who dramatically explains, with hand motions and sound effects, that Defendant hit Wilson twice, the second time "like he had every intention of killing" Wilson. Laquita also describes hearing gunshots prior to Wilson being struck by the car.

The State subsequently played a surveillance video for the grand jury, which Detective Sarabia testified was from a nearby gas station. During his testimony, Sarabia described the images appearing from the video, including Wilson in the middle of the street and Defendant's car going in circles. Sarabia also testified affirmatively to the prosecutor's question that "[w]e don't know how many times Brian Wilson was hit but Laquita said that he was hit twice, is that correct?" *ROP, July 22, 2020*, p. 9.

Detective Sarabia testified that Waukegan police officers were the first to respond to the scene and identified a recording from the body camera of one of those officers. The State then published the body-camera recording to the grand jury. *ROP, July 22, 2020*, p. 11. This court reviewed this recording as part of the hearing on the motion to dismiss, as well. The recording begins when the police arrive after the incident occurred. Wilson is laying on the street, surrounded by multiple unidentified people. One man says a car "ran him over". Another

4

woman, whom the grand jury learned through the WGN recording is Laquita, screams that Defendant is the one that hit Wilson with his car.

The State then presented an enhanced version of the surveillance video. Testifying while the images were presented to the grand jury, Detective Sarabia stated that Defendant "kept going in circles until Brian Wilson was run over." *ROP, July 22, 2020*, p. 12. The surveillance videos, both unenhanced and enhanced, appear to show Defendant's vehicle circling Wilson before Defendant aims the car at Wilson, accelerates, and Wilson moves quickly backward. Because a gas pump blocks the view, it is impossible to determine whether Wilson moves away under his own power or is pushed backward by Defendant's car.

Detective Sarabia further testified that Defendant left the scene of the incident and ultimately abandoned his car. The police subsequently swabbed the undercarriage and front right passenger wheel well of Defendant's vehicle, which tested positive for the presence of Wilson's blood. *ROP, July 22, 2020*, pp. 16-17.

In contrast to the October and November 2019 grand juries, Detective Sarabia did not inform the July 2020 grand jury of any eyewitness testimony or the gunshot residue on Brian Wilson's hand and face. Instead, Sarabia testified regarding that issue as follows:

Q: And at some point there was a gunshot?

A: Yes.

Q: We don't know any more about it, is that correct?

A: That's correct.

*ROP, July 22, 2020*, pp. 5-6.

5

The State continued, presenting multiple slides and corresponding questions concerning a gunshot flash seen on the surveillance video, emphasizing that at one point Laquita's taillights were on, then they were off, and one gunshot occurred. *ROP, July 22, 2020*, pp. 9-10.

Toward the end of the July 2020 presentation, a grand juror asked whether Defendant was the shooter. The Assistant State's Attorney replied: "No, we're not alleging he was the shooter also. We believe there was an altercation and we originally thought it may have been Brian Wilson. We don't know who the shooter was. We have not recovered the weapon or any projectile." *ROP, July 22, 2020*, p. 17.

The juror continued questioning, asking whether Defendant was shot. Again, the Assistant State's Attorney responded, as follows: "No, [Defendant] was not shot. Nobody was shot, is that correct?" Detective Sarabia then answered: "Correct". *ROP, July 22, 2020*, pp. 17-18.

The July 2020 grand jury returned a true bill, this time indicting Defendant for the offense of first degree murder (720 ILCS 5/9-1(a)). It is this indictment Defendant now seeks to dismiss.

## II. ANALYSIS

In general, a defendant may not challenge the validity of an indictment returned by a legally constituted grand jury. *People v. DiVencenzo*, 183. Ill. 2d 239, 255 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882; *People v. Wright*, 2017 IL 119561, ¶ 61. However, a trial court has the inherent authority to dismiss a criminal indictment where there has been a clear denial of due process. *People v. Stapinski*, 2015 IL 118278, ¶ 33. A denial of due process may occur "if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence."

6

*DiVencenzo*, 183 Ill. 2d at 257; *Wright*, 2017 IL 119561, ¶ 62. An indictment may also be dismissed where the prosecutor has applied undue pressure or coercion so that the indictment is, in effect, that of the prosecutor rather than the grand jury. *DiVencenzo*, 183 Ill. 2d at 257-58.

A court has authority to dismiss an indictment procured through prosecutorial misconduct only when the accused can show that such misconduct results in actual and substantial prejudice. *People v. Fassler*, 153 Ill. 2d 49, 58 (1992). Courts may not invade the independence of the grand jury by going behind an indictment to reweigh the competent evidence presented. *People v. Miller*, 100 Ill. App. 3d 122, 126 (2nd Dist. 1981) (citing *People v. Creque*, 72 Ill. 2d 515, 524 (1978)). The *DiVencenzo* court concluded that to "warrant dismissal of the indictment, a defendant must show that the State prevented the grand jury from returning a meaningful indictment by misleading or coercing it." *DiVencenzo*, 183 Ill. 2d at 258; *accord Wright*, 2017 IL 119561, ¶ 62.

Several appellate decisions have further addressed motions to dismiss indictments since the oft-quoted Illinois Supreme Court case *DiVencenzo* was decided in 1998. In *People v. Oliver*, 368 Ill. App. 3d 690, 694 (2nd Dist. 2006), the appellate court considered a defendant's argument that the indictment was sufficiently misleading to warrant dismissal. Addressing that challenge, the court held that "if the evidence was strong enough that the grand jury would have indicted the defendant despite the misconduct, the misconduct was not prejudicial. However, if the evidence was so weak that the misconduct induced the grand jury to indict, prejudice is shown." *Id.*, at 697. Some subsequent cases have adopted this language, holding that "[p]rosecutorial misconduct resulting in a due process violation is actually and substantially prejudicial only if the grand jury would not have otherwise indicted the defendant." *Legore*,

7

2013 IL App (2d) 111038, ¶ 23; see also *People v. Cross*, 2019 IL App (1st) 162108, ¶ 65 (applying *Oliver*, no due process violation or prejudice found in officer's grand jury testimony).

Interestingly, the Illinois Supreme Court has not since adopted that articulation of the prejudice that necessitates dismissal of an indictment. *People v. Wright*, 2017 IL 11956, provided our supreme court the most recent opportunity to address this issue. In *Wright*, the defendant argued that the indictment must be dismissed because the State presented deceptive evidence to the grand jury. *Wright*, 2017 IL 11956, ¶ 60. In making this argument, the defendant relied upon *Oliver* and its articulation of the law. *Wright*, 2017 IL 11956, ¶ 63. Addressing this issue, the supreme court first looked to *DiVencenzo* to set forth the legal framework for analyzing these issues. *Id.*, at ¶ 61. Turning to defendant's argument, the court addressed *Oliver*'s facts and the appellate court's holding. In deciding the issue, however, the supreme court did not engage in or adopt the *Oliver* articulation in its own analysis. *Id.*, at ¶ 67. Instead, the supreme court ultimately repeated the pronouncement of law from *DiVencenzo*, holding that the defendant "has not shown that the State prevented the grand jury from returning a meaningful indictment by misleading or coercing it." *Id.*

THE 2019 GRAND JURY EVIDENCE

Defendant claims that part of the State's misleading presentation involves its failure to present the detailed information about the on-scene shooting proffered to the 2019 grand juries to the July 2020 grand jury that indicted Defendant for first degree murder. The State responds that it did not mislead the July 2020 grand jury about the evidence presented to the two 2019 grand juries because the July 2020 grand jury had received and presumably reviewed the transcripts from those 2019 proceedings. As a result, the court must determine whether the July 2020 grand jury did in fact receive the October and November 2019 grand jury transcripts.

8

The court notes that when the State wishes a grand jury to consider prior testimony it is not uncommon for the prosecutor and witness to repeat, word for word, the question-and-answer testimony before the grand jury—essentially reading the prior testimony into the grand jury record. A twist on that practice is the prosecutor simply reading the entire prior testimony into the record. See *People v. Curoe*, 97 Ill. App. 3d 258, 970 (1st Dist. 1981) ("[s]everal Illinois cases have upheld criminal convictions where the indictments were based solely upon the sworn testimony of the prosecutor reading the transcript of proceedings before another grand jury"). With either procedure, the grand jury literally hears the testimony, leaving no doubt that the grand jurors had it before them.

Alternatively, the State could provide copies of the transcripts of the prior proceeding to the grand jury to review—which is what the State avers occurred in this case. Section 112-4(b) of the Code (725 ILCS 5/112-4(b)) specifically provides that the grand jury has the right to review any transcripts relevant to the matter being presented. However, it remains incumbent upon the State to ensure that a record is made before the grand jury of the evidence presented to the grand jury. See 725 ILCS 5/112-7 (requiring testimony before a grand jury be transcribed). Significantly, the State in this case did so in November 2019, when the grand jury was provided with the transcripts of the testimony it heard the month before, and the witness further confirmed it was his testimony—all on the November 2019 record. But in July 2020, when the State again presented this case to the grand jury, it neither read the 2019 transcripts into the 2020 grand jury record nor made a record that the 2020 grand jury had received the 2019 transcripts. The record from the 2020 grand jury proceedings is simply silent on this question.

Instead, weeks after the grand jury returned the indictment, the State filed an affidavit averring that the July 2020 grand jury was provided with transcripts from the prior two

9

proceedings. At the hearing on Defendant's motion to dismiss, the State presented no witnesses to testify to this issue (such as the prosecutor who appeared before the July 2020 grand jury). By filing an affidavit rather than presenting live testimony, the State deprived Defendant of the opportunity to test those claims through cross-examination. In addition, it similarly hampered the court's ability to make necessary creditability determinations and factual findings. See *People v. Wheeler*, 392 Ill. App. 3d 303, 310 (1st Dist. 2009) (trial court's determination of defendant's credibility via affidavit improper without evidentiary hearing). As a result, the court is unable to find that the July 2020 grand jury had the opportunity to consider the evidence from the two 2019 grand jury proceedings. Accordingly, the court is left to consider only the July 2020 grand jury transcript in deciding Defendant's motion.

### THE WGN RECORDING

Fundamentally, an indictment must be supported by sworn testimony. *Curoe*, 97 Ill. App. 3d at 269; *People v. Greer*, 336 Ill. App. 3d 965, 973 (5th Dist. 2003). To be properly considered by a grand jury, unsworn evidence must be based upon or related to that sworn testimony. Even where testimony is presented solely through leading questions and affirmative responses, "a duly-sworn witness actually testified to the factual correctness of all the question asked him by the prosecutor." *People v. Nolan*, 2019 IL App (2d) 180354, ¶ 24 (quoting *United States v. Brown*, 872 F.2d 385, 388 (11th Cir. 1989)).

As these issues are not litigated particularly frequently, the prevailing case law in this area spans several decades. See *Nolan*, 2019 IL App (2d) 180354, ¶ 11 (noting the "relatively few cases"). When courts addressed these issues even just a few decades ago, the overwhelmingly common practice was for grand juries to consider the sworn testimony of a witness providing verbal responses to verbal questions. Indeed, the language of the statute and

10

many cases assume this to be the standard operational paradigm. As we enter the third decade of the 21st century, in addition to traditional verbal testimony, it is becoming more common for grand juries to be presented with recorded and digital materials (just as petit juries are now commonly at trial). Yet the principles of grand-jury law remain the same. When grand juries rely upon recorded and digital evidence, as with any evidence presented to a grand jury, that evidence must have some basis in sworn testimony. Almost anything can be presented to a grand jury, but to be properly relied upon, it must constitute evidence, which means it must in some way be tethered to sworn testimony.

Presenting the WGN recording to the grand jury was important to the State because it (1) purports to identify Laquita describing how Defendant hit Wilson twice, including her belief that Defendant intended to kill Wilson the second time, (2) contains the reporter's opinion of "the brutal way Wilson was murdered", and (3) includes other statements by Wilson's family attesting to his good character and "protector" nature—matters that could be significant on the issue of self-defense or defense of others. But this recording was published to the grand jury solely with the prosecutor's words, "[s]o I'm going to play the WGN news clip." Detective Sarabia did not confirm what it is, testify to its origin, or say anything about its contents. In fact, Sarabia provided no sworn testimony regarding this recording at all.

It is well established that an officer testifying in front of a grand jury may properly relate what a witness said to another. *People v. Holmes*, 397 Ill. App. 3d 737, 742 (2nd Dist. 2010) (hearsay nature of testimony does not invalidate an indictment). Likewise, an officer may also properly testify regarding the statements a witness made on a recorded statement. In both these instances, despite their hearsay nature, a sworn witness—typically, the officer—is actually

11

testifying as to the statements presented. But in this case, no witness testified in any way regarding the WGN recording.[2]

Consider the following scenarios. During the investigation of an offense, the police interview a witness, who ultimately makes statements to the police regarding her observations. The police record the interview (perhaps a victim's statement contemplated by section 115-10 of the Code (725 ILCS 5/115-10)). The police also take various crime-scene photographs.

The police officer later testifies before the grand jury. During the officer's (sworn) testimony, he testifies regarding the statements made by the witness during the interview. It is beyond question that the grand jury could properly rely upon that testimony in returning an indictment. *Holmes*, 397 Ill. App. 3d at 742. Assume further that during his testimony, the State publishes the photographs of the crime scene to the grand jury, and the officer testifies as to the contents of the photographs. Again, the grand jury could properly rely upon that evidence and consider the contents of the photographs in returning an indictment.

Assume instead that the officer testifies before the grand jury that he interviewed the witness, that the interview was recorded, and then publishes the recording of the interview for the grand jury—but does not himself testify as to the specifics of the witness's statements. Here, too, the grand jury could properly rely upon the contents of the recording in returning an indictment.

Now assume that rather than calling the officer to testify, the State simply played the recording of the police interview with the witness for the grand jury. It seems clear that absent any sworn evidence before the grand jury regarding the recording, the recording could not

---

[2] While Detective Sarabia did testify that "Laquita said [Wilson] was hit twice" (*ROP, July 22, 2020,* p. 9), he never testified to the source of that statement. As a result, that testimony fails to connect the WGN recording to sworn evidence before the grand jury.

properly be considered by the grand jury. The same would hold true if the State simply published the photographs without any testimony as to their contents. See *Curoe*, 97 Ill. App. 3d at 269 (indictment based solely on the unsworn testimony presented to grand jury subject to dismissal).

That is essentially what the WGN recording is here. Absent any sworn testimony regarding the WGN recording, it was improper for the grand jury to consider it. To be sure, the type and scope of evidence upon which a grand jury can rely is remarkably broad. The familiar rules of evidence do not apply. Ill. R. Evid. 1101(b)(2) (Illinois Rules of Evidence do not apply to proceedings before grand juries). Indeed, a grand jury can even consider unconstitutionally obtained evidence. *U. S. v. R. Enterprises, Inc.*, 498 U.S. 292, 298 (1991) (fourth amendment exclusionary rule does not apply to grand jury proceedings). But evidence presented to a grand jury must be connected to sworn testimony. See *Nolan*, 2019 IL App (2d) 180354, ¶ 24; *Curoe*, 97 Ill. App. 3d at 269; *Greer*, 336 Ill. App. 3d at 973.

Ultimately, although the WGN recording should not have been considered by the grand jury because of the improper way it was presented, the court does not need to reach the question whether that alone would warrant dismissal of the indictment due to the issues regarding the gunshot evidence, addressed below.

### THE GUNSHOT EVIDENCE

Defendant further argues that the State mislead the July 2020 grand jury concerning the gunshot that occurred during the incident. The State presented evidence to the July 2020 grand jury including multiple slides from surveillance video showing a gunshot flash. Toward the end of the proceeding, a grand juror asked whether Defendant was the shooter. The Assistant State's Attorney—who was not a sworn witness—replied, "[n]o, we're not alleging he was the shooter

13

also. We believe there was an altercation and we originally thought it may have been Brian Wilson. We don't know who the shooter was. We have not recovered the weapon or any projectile." *ROP, July 22, 2020,* p. 17.

To be sure, most of these unsworn statements by the Assistant State's Attorney find support in Detective Sarabia's sworn testimony. In fact, Sarabia specifically testified before the July 2020 grand jury that "we don't know anything more about [the gunshot]." *ROP, July 22, 2020,* p. 5. As such, standing alone, the prosecutor's comments would not work a substantial prejudice to Defendant. See *Miller*, 100 Ill. App. 3d at 126-27 (prosecutor's unsworn statements, heard in conjunction with sworn testimony, fail to demonstrate substantial injustice).

However, Detective Sarabia's 2020 testimony (amplified by the Assistant State's Attorney's unsworn statements) contradicts Sarabia's extensive previous testimony on this issue before the 2019 grand juries. Sarabia's 2019 testimony included (1) Defendant's telling police that he was being shot at while he lost control of his car, (2) two eyewitness statements that Wilson was shooting at Defendant, including one that Defendant struck Wilson with the car after Wilson fired the gun, (3) a shell casing located at the scene, (4) Laquita removing a gun from Wilson after he was struck, (5) gunshot residue on Wilson's hands and face, and (6) Defendant's statement to 911 that he was defending himself because Wilson shot at him. This is the kind of evidence that Defendant would present if he were trying to show that Wilson may have been an aggressor and Defendant was acting in self-defense—or that the State would present if it were to prosecute Wilson (under different circumstances) with various weapons offenses. Indeed, the very question of whether Defendant was acting in self-defense arose during the October 2019 grand jury session, and that grand jury ultimately chose to indict Defendant for the offense of leaving the scene of an accident involving death or personal injury, not first degree murder.

14

During the hearing on the motion to dismiss, the State described the evolution of its investigation—which, according to the prosecutor, showed that the shooter was an unknown individual, not Wilson. These conclusions demonstrate that the State, including Detective Sarabia, knew quite a bit more about the gunshot than stated in response to the grand juror's question. Even still, the State erroneously informed the grand jury that it "didn't know any more about" the gunshot.

The State "plays a substantial role in the grand jury proceedings and serves as advisors to the grand jury." *DiVencenzo*, 183 Ill. 2d at 254. Prosecutors "inform the grand jury of the proposed charges and the pertinent law." *Id.* And, although the State has no duty to present exculpatory evidence to a grand jury (*People v. Shelton*, 401 Ill. App. 3d 564, 571 (1st Dist. 2010)), it does have an affirmative duty to not mislead it. This duty to not mislead applies to both questions of fact and law.

In *People v. Hunter*, 298 Ill. App. 3d 126 (2nd Dist. 1998), the defendant was indicted for involuntary manslaughter after a couch he and a codefendant were moving fell from a second story window, striking and killing a pedestrian. *Id.*, at 128. During an officer's testimony before the grand jury, a grand juror asked whether the defendant had given a statement that the couch had slipped. The officer said that he had not; however, the defendant had given the police a written statement that a rope used to lower the couch had slipped, causing the couch to fall. Based upon this erroneous evidence, the Second District Appellate Court affirmed the trial court's dismissal of the indictment for a due process violation. *Id.*, at 130.

In *People v. Mattis,* 367 Ill. App. 3d 432 (2nd Dist. 2006), the defendant alleged that the grand jury witness testified inaccurately and the prosecutor's unsworn comments were improper. Although finding that the State's presentation included inaccurate information, the court

15

ultimately concluded that those discrepancies were primarily "minor details that could not have affected the grand jury's" decision to return the indictment. *Id.*, at 436.

In *People v. Reimer*, 2012 IL App (1st) 101253, the defendant was charged with violating the Home Repair Fraud Act when he failed to complete a residential construction project. During the grand jury proceedings, a grand juror asked about the intent required for the charge. The State responded, relying on an unconstitutional aspect of the statute to define intent, then incorrectly stated that intent was not an element to be proven under the Home Repair Fraud Act. *Id.*, at ¶ 30. On appeal, the *Reimer* court held that that "the prosecutor's misstatement of the law made it easier to secure an indictment." *Id.*, at ¶ 29. Ultimately, the court concluded that the defendant suffered prejudice as "the two misstatements affected the grand jury proceedings because without them, we cannot say that a true bill would have been returned." *Id.*, at ¶ 32.

The State's presentation of evidence to the July 2020 grand jury included when the gunshot occurred and how it was visible on the surveillance video—and then the State presented nothing more about it. When a grand juror (as happened in *Hunter* and *Reimer*) asked for more information, the State committed two errors: the prosecutor provided an unsworn response on that factual question, and Detective Sarabia's sworn testimony was inaccurate; together, those responses were ultimately misleading. Unlike in *Mattis*, the discrepancies here were not minor details. The State had an obligation to accurately present its gunshot information to the July 2020 grand jury. *Hunter*, 298 Ill. App. 3d at 130. By incorrectly representing it did not know anything more about the shooting, the State changed the complexion of the case and "made it easier to secure an indictment". *Reimer*, 2012 IL App (1st) 101253, ¶ 29.

The failure to provide the known gunshot evidence via accurate testimony from Detective Sarabia, along with the prosecutor's unsworn comments on that issue, in light of the failure to

16

establish that the July 2020 grand jury received the 2019 grand jury transcripts, compounded by the improper presentation of the WGN recording, together prejudiced Defendant by misleading the July 2020 grand jury such that it was prevented from returning a meaningful indictment. *DiVencenzo*, 183 Ill. 2d at 258; *Wright,* 2017 IL 119561, ¶ 62.

The court notes that different Assistant State's Attorneys presented this case each time it appeared before the grand jury. *DiVincenzo* relied upon, among other cases, *United States v. Hogan*, 712 F.2d 757, 762 (2nd Cir. 1983), a case in which "the factual misstatements in the . . . [grand jury] testimony may have been inadvertent." Several panels of the Illinois Appellate Court have since applied *DiVincenzo* to hold that the presentation of misleading evidence denies due process regardless whether it was inadvertent or intentional. *Oliver*, 368 Ill. App. 3d at 696; *Reimer*, 2012 IL App (1st) 101253, ¶ 33. As such, under the law it is irrelevant whether the State's actions were intentional or not, and the court therefore expresses no opinion on that matter.

### III. CONCLUSION

In *People v. Rebollar-Vergara*, 2019 IL App (2d) 149871, the State appeared before the grand jury either "misinformed" or "ill-prepared". *Id.*, at ¶ 112 (Jorgensen, J., specially concurring). Although the prosecutor's questions there were far from "a model of clarity" (*id*, at ¶ 73), because "at worst" the testimony could have been interpreted as "an imprecise representation of certain evidence" (*id.*, at ¶ 76), the court concluded it did not warrant dismissal of the indictment. *Id.*, at ¶¶ 73-76. In reaching that conclusion, however, court noted that, under different facts, misleading testimony before a grand jury can lead to the dismissal of an indictment. *Id.*, at ¶ 64. For the reasons stated above, this is such a case.

Challenges to grand jury proceedings are limited, and rightly so. Such challenges should not be taken lightly, and this is particularly true when a grand jury has indicted a defendant on the charge of first degree murder. Defendants, victims, and the community as a whole benefit from a full adjudication of serious cases through the crucible of trial. Dismissing an indictment due to procedural irregularities forecloses the "community catharsis" (*Richmond Newspapers, Inc. v. Virginia*, 488 U.S. 555, 571 (1980)) that occurs when the merits of a case are laid bare under the bright light of trial.

As Justice Frankfurter wrote for the United States Supreme Court nearly a century ago, it is "the duty of courts [to be] agencies of justice and custodians of liberty." *McNabb v. United States*, 318 U.S. 332, 347 (1943). One of the blessings of living in a free society is that its members enjoy the liberty to seek redress in our courts of justice. Our "history of liberty has largely been the history and observance of procedural safeguards." *Id.* Our very system of justice is predicated upon the concept of due process. Without fidelity to ensuring that (1) every member of our community receives due process, and (2) the procedural safeguards enshrined in our constitution are protected, there can be no liberty.

For reasons stated above, Defendant's motion to dismiss the indictment is GRANTED.

ENTERED: _Daniel B. Shanes_

Judge Daniel B. Shanes

18