# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

VINCENT E. YORK, JR.,
       Plaintiff

              v.

JOSE SARABIA *et al.*,
       Defendants

No. 21 CV 3978

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the defendants, Detective Jose Sarabia and the City of North Chicago's, motion for summary judgment on the plaintiff, Vincent York's, wrongful arrest, unlawful detention, malicious prosecution, and related claims. (R. 78.) Specifically, the defendants assert that they are entitled to summary judgment on all claims because (1) Sarabia has absolute witness immunity, (2) probable cause existed for York's arrest, (3) Sarabia "did not initiate or commence any prosecution," and (4) Sarabia has qualified immunity. (R. 80 at 2.)[1] For the reasons that follow, the motion is granted in part and denied in part.

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case.[3]

### I. CONFRONTATIONS BETWEEN YORK AND WILSON

The events of this case started on September 14, 2019. Throughout that day, York had been caring for his daughter, whom he shared with his ex-partner, Laquitta York. (Pl. Resp. to Def. SOF ¶ 5.) When York went to drop his daughter off with Laquitta, he was confronted by Laquitta's boyfriend, Brian Wilson, who "threatened and pushed [York] away." (*Id.* ¶ 7.) After York left, he continued to speak with Laquitta on the phone; he determined that Laquitta seemed to "want[ ] to work things out" so he drove back toward her house. (*Id.* ¶ 9.) They did not meet at Laquitta's house, however, but at a nearby Citgo gas station. (*Id.* ¶ 11.) York exited his vehicle and approached Laquitta, who was in her car. (*Id.*) The two continued to argue, and

---

[2] Defendants' Statement of Undisputed Material Facts ("Def. SOF") (R. 79); Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1(B)(3)(c) ("Pl. SOF") (R. 88); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Pl. Resp. to Def. SOF") (R. 89); Defendants' Response to Plaintiff's Statement of Additional Facts ("Def. Resp. to Pl. SOF") (R. 101.)

[3] The defendants have moved to strike York's exhibits. (R. 100.) First, they argue that York's statement of facts should be stricken for including an additional 15 facts in violation of the local rules. (*Id.* at 1, ¶ 2.) The Court has discretion to enforce its local rules. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021). That said, in its consideration of the summary judgment motion, the Court found that certain of the additional facts were material to the disposition of the case. So, it declines to strike them. The Court will, however, remind York's lawyer that she is expected to comply with all of the Court's rules, including the local rules, going forward. In addition, the defendants' motion to strike asks the Court to strike the transcripts of certain grand jury proceedings and an opinion from a Lake County circuit court judge. (R. 100 at 1–2, ¶ 4.) The Court did not rely on these documents in coming to its decision on this motion; for instance, certain of those additional facts cited not to the grand jury transcript, but to Sarabia's deposition transcript. As such, the Court denies the motion to strike.

2

York realized that Wilson was in the passenger seat of Laquitta's car. (*Id.* ¶ 12.) As the argument continued, Wilson grabbed York's arm through the window and pulled him close to the car. (*Id.* ¶ 13.) York and Wilson punched each other, and Laquitta drove "about 50 feet across the street with Wilson still holding York's arm." (*Id.* ¶ 14.) York managed to get his arm away from Wilson and "ended up face-first on the concrete." (*Id.* ¶ 15.) "When York looked up, he saw Wilson standing over him with a gun pointed at him." (*Id.* ¶ 16.) York heard a gunshot while he was still on the ground; he "army crawled into a running position" toward his own car and was hit by an oncoming car. (*Id.* ¶ 18.) There were two more gunshots. (*Id.* ¶ 19.) York dove into his car, ducked down, and started to drive away. (*Id.* ¶¶ 20–21.) While driving, York "stayed down by the wheel well and couldn't see anything but the seat" so as to "avoid getting shot by [ ] Wilson." (Def. Resp. to Pl. SOF ¶ 1.) "York's car was going in circles . . . and [he] heard multiple loud bangs and hit something, which [York] believed to be a curb or sign." (Pl. Resp. to Def. SOF ¶ 22.) In fact, during these events, York struck "Wilson with his car," leading to Wilson's death. (R. 80 at 1.)

## II.    THE 911 CALLS

As York drove away from Citgo, he called 911. (Pl. Resp. to Def. SOF ¶ 24.) The call was routed to the Waukegan Police Department. (Def. Resp. to Pl. SOF ¶¶ 9, 25.) This is relevant because the Citgo where the shooting took place was actually in North Chicago, which shares a border with Waukegan. (*See* R. 79-2 ("Sarabia Dep.") at 71:7–73:7 (describing North Chicago jurisdiction and location of Citgo).) York reported to the dispatcher that "Wilson fired shots at him in front of the Citgo [g]as

[s]tation." (Def. Resp. to Pl. SOF ¶ 2.) York also reported that "he did not know if he struck Wilson." (Pl. Resp. to Def. SOF ¶ 25.) York had two more phone conversations with the Waukegan 911 operator, separate from his initial 911 call. (Def. Resp. to Pl. SOF ¶ 3.) The operator told York to return to the scene and then to go to the North Chicago Police Department (NCPD). (Pl. Resp. to Def. SOF ¶¶ 27–28.) York was also asked by the Waukegan dispatcher how Wilson "ended up with a bullet hole in his head." (Def. Resp. to Pl. SOF ¶ 5.) York chose not to return to the scene because "Wilson was shooting at him [earlier] and he did not feel safe." (*Id.* ¶ 4.) He also chose not to go to the NCPD "because he was being accused of shooting Wilson in the head and wanted to consult with an attorney." (*Id.* ¶ 7.)

### III. THE INVESTIGATION

Meanwhile, the NCPD began an investigation into the Citgo incident. Detective Sarabia was the lead investigator. (Sarabia Dep. at 21:22–22:3.) Sarabia checked the NCPD 911 call logs and did not see any calls from York's phone number. (Pl. Resp. to Def. SOF ¶ 35.) But "[b]ecause [Waukegan and North Chicago] share a border, [ ] Sarabia knew that 911 calls can go to the Waukegan or North Chicago dispatch center depending on the location of the caller." (Def. Resp. to Pl. SOF ¶ 8.) A different officer, Detective Flores, was sent to get records from the Waukegan police department. (Pl. Resp. to Def. SOF ¶ 32.) "Flores did not receive any 911 call logs from Waukegan PD." (*Id.* ¶ 33.) During the investigation, Sarabia and his fellow detectives "located and interviewed three eyewitnesses to the shooting . . . who all saw Wilson with a handgun shooting in the air and at York." (Def. Resp. to Pl. SOF

4

¶ 14.) Other evidence was collected related to Wilson using a gun at the Citgo. (*Id.* ¶¶ 15–17.)

On September 17, 2019, York self-surrendered to the NCPD. (*Id.* ¶ 19.) He was accompanied by an attorney. (*Id.*) During his interview, York told Sarabia and Detective Mueller, who was also present in the interview, that "he called 911 and reported the accident minutes after it happened." (*Id.* ¶ 20.) York consented to a search of his phone; his attorney offered to print out phone logs as well, but the detectives declined that offer because they had their own technicians to do data dumps. (*Id.* ¶¶ 22–23.) T-Mobile phone logs that were later obtained showed that York called 911 on September 14, and that minutes later, a Waukegan municipal number called him twice. (*Id.* ¶ 25.) York's phone also showed the calls from the Waukegan municipal number. (*Id.* ¶ 26.) The officers made no additional follow-up regarding any phone records from Waukegan. When the interview was over, York was placed in a holding cell to await a charging decision. (*Id.* ¶ 43.)

## IV. CHARGING DECISION

After the interview, an Assistant State's Attorney ("ASA") from the Felony Review Unit of the Lake County State's Attorney's Office ("LCSAO") came to the NCPD to meet with the officers and discuss the case. (R. 79-3 ("Rollins Dep.") at 33:8–34:15.) At these "roundtable" discussions, "the lead officer does the presentation." (*Id.* at 37:7–9.) In this case, that would have been Sarabia or Mueller, or both together. (*Id.* at 37:17–24.) At his deposition, Detective Rollins, who was present at the roundtable, testified that he "d[id] not recall [ ] Sarabia telling the Felony Review

5

ASA about the Waukegan [m]unicipal calls on [York's] phone[.]" (Def. Resp. at Pl. SOF ¶ 35.)

The day after the roundtable, Mueller "went to York's holding cell to explain that they were going to take him to (Lake) County on a charge of leaving the scene of an accident because he did not call the police." (Pl. Resp. to Def. SOF ¶ 53.) Sarabia ultimately signed the criminal complaint "charging York with violating [Illinois statute] 625 ILCS 5/11-401 for failing to report an accident or leaving the scene of an accident resulting in death." (*Id.* ¶ 56.)

## V.    GRAND JURY PROCEEDINGS

After York was charged with fleeing the scene, a grand jury session was convened on October 16, 2019. (*Id.* ¶ 60.) During that session, Sarabia testified that "North Chicago 911 dispatch had no record that York called 911 after the incident." (*Id.* ¶ 61.) York asserts that this and related testimony regarding the 911 calls were lies. (*See, e.g.*, R. 93 at 5–6.) The grand jury returned an indictment for fleeing the scene ("First Indictment"). (Pl. Resp. to Def. SOF ¶ 62.) However, shortly after this indictment, the LCSAO learned that "York's criminal defense attorney possessed 911 calls that York had made to Waukegan 911 dispatch." (*Id.* ¶ 63.) Sarabia retrieved those records from the defense attorney and provided them to the LCSAO. (*Id.* ¶ 64.) Once the calls were reviewed, in November 2019, Sarabia returned to the grand jury for a second time, testifying as to their existence. (*Id.* ¶ 67.) The LCSAO dismissed the fleeing-the-scene charges against York. (*Id.*)

However, nearly eight months later, on July 20, 2020, Sarabia was contacted by ASA Kenneth LaRue, who "stat[ed] that criminal charges were going to be brought against York." (*Id.* ¶ 69.) Sarabia had not had any contact with LaRue in the intervening months before this email. (*Id.*) Sarabia was brought before the grand jury again on July 22, 2020; LaRue did not prep him in advance. (*Id.* ¶ 71; Def. Resp. to Pl. SOF ¶ 46–47.) "Sarabia only learned at the third Grand Jury that the LCSAO was now pursuing murder charges against York relative to the death of Wilson." (Pl. Resp. to Def. SOF ¶ 72.) During the session, Sarabia testified "in the affirmative" that he "d[idn't] know anymore about [the gunshot]' from the Citgo incident. (Def. Resp. to Pl. SOF ¶ 47.) According to York, that was a lie. (*Id.* ¶¶ 48–52.) A murder indictment was returned ("Third Indictment") but ultimately dismissed in December 2020. (*Id.* ¶ 54.)

## VI. THIS CASE

York brought this lawsuit against the defendants—and others who have since been dismissed—alleging a Fourth Amendment false arrest claim under 42 U.S.C. § 1983 (Count I), a Fourth Amendment unlawful detention claim under § 1983 (Count II), a malicious prosecution claim[4] (Count III), a conspiracy claim pursuant to § 1983 (Count IV),[5] and an indemnification claim (Count V). (R. 20.)

---

[4] There is no federal claim for malicious prosecution in the Seventh Circuit. *Beck v. City of Chicago*, No. 20 C 5329, 2020 WL 7353405, at *6 (N.D. Ill. Dec. 15, 2020) (citing *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018)). The Court exercises pendent jurisdiction over this state law claim. 28 U.S.C. § 1367.

[5] In a footnote, York states that "[w]ith the dismissal of [ ] Mueller as a defendant, [York] will dismiss his conspiracy claim." (R. 93 at 2 n.1.) The Court treats this as a motion to voluntarily dismiss that claim and grants the motion as such. *See EEOC v. DHL Express*, 10

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). If a reasonable jury, when viewing the record and all reasonable inferences from it in the light most favorable to the nonmovant, could return a verdict for the nonmovant, then a genuine dispute of material fact exists." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the Court "construe[s] all facts and draw[s] all reasonable inferences in the nonmoving party's favor[.]" *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citations omitted).

## ANALYSIS

### I.    ABSOLUTE IMMUNITY

The defendants argue that all of York's claims against Sarabia are barred because he "enjoys absolute witness immunity from liability for his testimony to the grand juries." (R. 80 at 3.) In the defendants' view, Sarabia "had no choice in serving as a witness before the grand jury," and even if he "testified falsely, mistakenly, or incorrectly . . . and/or conspired with any prosecutor to do so," Sarabia is "absolutely immune" from liability. (*Id.* at 3, 5.) York counters that this "oversimplified argument

---

C 6139, 2011 WL 6825497, at *1 n.1 (N.D. Ill. Dec. 27, 2011) (construing statement that claim was withdrawn as a "motion to voluntarily dismiss those claims" and acting accordingly).

. . . fails to accept that [ ] Sarabia's misconduct extended beyond his actual testimony before the Grand Jury." (R. 93 at 4.) In support, York describes several aspects of the case that Sarabia was allegedly involved in, including, among other things, the investigation into Wilson's death as "lead investigator" and his meeting with the felony review prosecutor. (*Id.* at 4–6; *see, e.g.*, Def. Resp. to Pl. SOF ¶¶ 12, 29–33.)

Grand jury witnesses have absolute immunity "from any § 1983 claim based on the witness' testimony." *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). But the Supreme Court was clear that such absolute immunity does not extend to "*all* activity that a witness conducts outside of the grand jury room." *Id.* at 370 n.1 (emphasis in original). In other words, a detective who testifies in front of the grand jury cannot "retroactively immunize himself from conduct [outside the grand jury] by perfecting his wrong-doing" through his testimony and then "arguing that the tort was not completed until a time at which he had acquired absolute immunity." *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017).

To suggest that the Fourth Amendment claims against Sarabia are based solely on his grand jury testimony is contrary to the record before the Court. There is no dispute that Sarabia was the lead investigator on Wilson's death case. (Def. Resp. to Pl. SOF ¶ 12.) In that role, he located and interviewed eyewitnesses. (*Id.* ¶¶ 14, 17.) Sarabia also interviewed York after he turned himself in. (*Id.* ¶ 20; Pl. Resp. to Def. SOF ¶ 38.) During that interview, York showed Sarabia his phone, which "showed the calls from the Waukegan municipal number minutes after the accident." (Def. Resp. to Pl. SOF ¶ 26.) Sarabia also participated in the round table discussion

with the LCSAO, and he likely led it, as "primarily, the lead officer does the presentation." (*Id.* ¶ 32; Rollins Dep. at 37:8–9, 13–14.) Though York had told Sarabia about the 911 calls he made, Rollins testified that he "d[id] not recall Detective Sarabia telling the Felony Review ASA about the Waukegan Municipal calls on Mr. York's phone at the round-table presentation." (Def. Resp. to Pl. SOF ¶ 35.) And this was a crucial issue during that discussion. (*Id.* ¶ 34 (citing Rollins Dep. at 40:18–22).) Then, after these investigatory steps were taken, Sarabia testified before the grand jury. (*Id.* ¶¶ 39–40; Pl. Resp. to Def. SOF ¶¶ 60–62.) This is not a case where York's § 1983 claims are "based [solely] on [Sarabia's] testimony." *Rehberg*, 566 U.S. at 369. Rather, the claims are based on a myriad of actions taken by Sarabia, which culminated in the charges brought against York. There is no absolute immunity for that. Therefore, the Court denies the defendants' motion on that basis.

York also argues that Sarabia is not entitled to absolute immunity for "lying to the grand jury." (R. 93 at 8.) From York's perspective, Sarabia testified in his first grand jury appearance that York did not call 911, and that there was no evidence of those calls on York's phone. (*Id.*; *see also* Def. Resp. to Pl. SOF ¶¶ 39–40.)[6] The defendants counter that not only is Sarabia absolutely immune for his testimony in

---

[6] The Court notes that York asserted that in Sarabia's third appearance before the grand jury, he lied when he said he "knew 'nothing else about the gunshot,'" and that was the "factual predicate for York's Fourth Amendment claims for false arrest and unlawful detention." (R. 93 at 9.) However, as the Court will discuss, the false arrest and unlawful detention claims related to York's murder charge must be dismissed. The Court therefore will not address whether York has absolute immunity for that purported lie to the grand jury, in this context.

front of the grand jury, but even if he did lie to the grand jury, the testimony is irrelevant to the Fourth Amendment claims York brought. (R. 102 at 6.)

While Sarabia is absolutely immune from claims based on his grand jury testimony, *Rehberg*, 566 U.S. at 369, that does not render the grand jury testimony irrelevant. And the defendants' argument that the grand jury testimony is irrelevant does not square with their argument that the testimony is what underpinned the charges. But more importantly, just because the jury cannot find Sarabia liable for his grand jury testimony, this does not mean that they cannot weigh what, if any, effect Sarabia's grand jury testimony has on his credibility here. York says that Sarabia lied about the 911 calls. (Def. Resp. to Pl. SOF ¶¶ 39–40.) The defendants assert that Sarabia testified that North Chicago 911 dispatch "had no record that York called 911 after the incident." (Pl. Resp. to Def. SOF ¶ 61.) The first grand jury returned an indictment for leaving the scene of an accident. (*Id.* ¶ 62.) Whether Sarabia's purportedly false testimony led to this outcome is at issue. *See Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) (citing *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013), for the proposition that evidence of causation for a constitutional violation include actions that officers took to further the prosecution after arrest)). A jury should hear this evidence, which precludes a finding that absolute immunity applies to Sarabia's grand jury testimony.

## II.  MERITS OF YORK'S CLAIMS

York's Fourth Amendment claims relate to the actions taken with respect to both the First Indictment and the Third Indictment. (*See generally* R. 20.) The Court

11

first addresses the claims stemming from the First Indictment and then turns to Sarabia's conduct with respect to the Third Indictment.

### A. First Indictment

#### 1. Probable Cause

The defendants argue that all of York's claims are barred by the existence of probable cause. (R. 80 at 5.) They assert the indictment returned against York for violating 625 ILCS 5/11-401 is a "felling blow" to York's claims because "[a]n indictment is *prima facie* evidence that probable cause existed for an arrest." (R. 80 at 5 (citing *Andersen v. Vill. of Glenview*, 2018 WL 6192171, at *15–16 (N.D. Ill. 2018)). York counters that "[t]he mere fact that an indictment [was] obtained based on [ ] Sarabia's false narrative does not shield him from liability for the false testimony and misconduct that secured that very indictment." (R. 93 at 10.) Moreover, York asserts that "there is a genuine issue of fact as to whether there was probable cause as to the first indictment." (*Id.* at 11.)

"Probable cause is an absolute defense to a Fourth Amendment unlawful detention claim, whether it is for false arrest, false imprisonment, or malicious prosecution." *Franklin v. Askew*, 19 C 4375, 2022 WL 17093358, at *4 (N.D. Ill. Nov. 21, 2022) (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). "Probable cause exists if the facts available at the time of an individual's arrest are sufficient to support a reasonable person believing the individual has committed an offense." *Muhammad v. Vill. of South Holland*, 12 C 275, 2013 WL 178848 at *3 (N.D. Ill. Apr. 25, 2013) (citing *Chelios v. Heavener*, 520 F.3d 678. 686 (7th Cir. 2008)). At summary judgment, "[York] must raise a genuine dispute of material fact to support

the absence of probable cause." *Franklin*, 2022 WL 17093358, at \*4 (citing *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001)). While typically the existence of probable cause is a jury question, "a court can determine if probable cause exists where the underlying facts are not in dispute." *Muhammad*, 2013 WL 178848 at \*3 (citing *Chelios*, 520 F.3d at 686).

The focus of the defendants' argument is that based on the evidence, "there was probable cause for [York's] arrest for leaving the scene." (R. 80 at 5.) First, the statute requires that a driver in a motor vehicle crash "resulting in personal injury to or death of any person" stops immediately and remains at the scene of the crash. 625 ILCS 5/11-401(a). If a person failed to stop or remain at the scene of the crash, they must "report the place of the crash, the date, the approximate time, the driver's name and address . . . at a police station or sheriff's office near the place where such crash occurred." *Id.* at (b). The defendants' view of the evidence is that York did not remain at the scene of the vehicle accident. (R. 80 at 7; Pl. Resp. to Def. SOF ¶ 23.) And though York called 911, (Pl. Resp. to Def. ¶ 24–25), he failed to either return to the scene or go to the NCPD. (R. 80 at 7.) In contrast, York asserts that his actions do not meet the elements of the offense in that he did not know, as the statute requires, that the accident involved another person. (R. 93 at 11–12*); see also Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013) ("The existence of probable cause . . . depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law."). York maintains that he was fleeing because Wilson was shooting at him, and that he hit something that he thought was a "curb

or a sign." (Pl. Resp. to Def. SOF ¶¶ 21–22.) He also told the dispatcher that he did not know what he hit. (*Id.* ¶ 25.) This demonstrates to the Court that there is a fact issue as to whether there was probable cause to arrest York for the offense because he allegedly lacked the required *mens rea. See generally People v. Meuris*, 51 N.E.3d 1102 (Ill. App. Ct. 2016) (explaining how for 625 ILCS 5/11-401(a) offense, a requirement of the offense is that defendant had knowledge of an accident involving a person).

There is also the issue of the 911 calls. York posits that the "first grand jury indictment was based on [ ] Sarabia's false testimony that he searched for 911 calls and that York's phone had 'no indication' of any 911 calls." (R. 93 at 11.) In Sarabia's investigation, Sarabia found there were no North Chicago 911 calls from York. (Pl. Resp. to Def. SOF ¶ 35.) Sarabia also had a different officer attempt to obtain records from Waukegan, but no records were returned. (*Id.* ¶ 33.) Nonetheless, he did not arrest York then; he moved forward with York's interview. (*Id.* ¶¶ 37–38; Def. Resp. to Pl. SOF ¶ 19.) York not only told Sarabia that he called 911 and reported the accident, but he also consented to a search of his phone, which showed calls from a Waukegan municipal number "minutes after the accident." (Def. Resp. to Pl. SOF ¶ 20, 22, 26.) According to York, Sarabia did not follow up on this; the defendants state that that Sarabia assumed there were no calls (*id.* ¶ 27), despite what he learned in the interview with York. Then, Sarabia testified in front of the grand jury that he found "no indication" of calls on York's phone, and that he "searched 'the 911 call logs'" and there was no evidence of calls. (*Id.* ¶¶ 39–40.)

Viewing this evidence in York's favor, whether Sarabia had probable cause to arrest is in dispute because he had knowledge of a possible report made about the accident and seemingly ignored it in favor of the evidence he already acquired. To be sure, "police officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness." *Mustafa*, 442 F.3d at 548. But that is not what we are talking about here. Here, the facts show that the investigation included talking to witnesses—none of whom seemingly described a car accident resulting in injury or death, (*see* Def. Resp. to Pl. SOF ¶¶ 14–18)—attempting to obtain phone calls, (*id.* ¶ 13; Pl. Resp. to Def. SOF ¶¶ 33, 35), and then talking to York, who stated he made those phone calls, (Def. Resp. to Pl. SOF ¶ 20), before any arrest determination was made. These demonstrate that there is a fact dispute as to whether Sarabia had probable cause to arrest and detain York, (*see* R. 79-9 at 2 (arrest record prepared by Sarabia).) This dispute also impacts the grand jury testimony Sarabia later gave, that led to the indictment returned against York. Therefore, the Court denies the defendants' motion for summary judgment on this basis as it pertains to the 625 ILCS 5/11-401 charge.

## 2.      Malicious Prosecution

The defendants argue the malicious prosecution claim should still fail, even if their absolute immunity and probable cause arguments do not carry the day. (R. 80 at 8.) To succeed on a malicious prosecution claim, York must prove "(1) commencement or continuation of a judicial proceeding, (2) favorable termination, (3)

absence of probable cause, (4) malice, and (5) damages." *Johnson v. Perez*, No. 12 C 9225, 2025 WL 1029254, at *8 (N.D. Ill. Apr. 7, 2025).

The defendants suggest that the malicious prosecution claim also fails because "there is no evidence that [ ] Sarabia initiated these proceedings [related to the 625 ILCS 5/11-401 charge]." (R. 80 at 8.) That argument fails. "The Seventh Circuit has consistently recognized malicious prosecution claims against police officers, particularly when there has been an allegation of misconduct on the part of the police." *Gardley v. City of Chicago*, No. 20 C 5149, 2022 WL 6757610, at *8 (N.D. Ill. Oct. 11, 2022); *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."). As has been discussed, York has presented evidence that a reasonable jury could use to determine Sarabia lied to the grand jury regarding the events from September 14, 2019, and that these lies led to the grand jury returning an indictment for fleeing the scene. (Pl. Resp. to Def. SOF ¶ 62.) This means there is a factual dispute, and this claim must go to the jury.

In sum, as it relates to Counts I through III and pertains to the 625 ILCS 5-11/401 indictment, the defendants' motion for summary judgment is denied.

### B.   Third Indictment

#### 1.   Probable Cause

With respect to the Fourth Amendment claims relating to York's murder charge, the defendants assert that York failed to address that "Sarabia did not arrest

or detain York for murder." (R. 102 at 3.) This is true; as such, any arguments regarding Sarabia's involvement in York's arrest and detention for murder are waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Moreover, there is no evidence in the record that Sarabia arrested York for murder, placed him into custody for that offense, or signed a criminal complaint against him. He therefore cannot be held liable. *See Gholson v. Lewis*, 2008 WL 4976246, at *2 (N.D. Ill. Nov. 19, 2008) (explaining that false arrest claim against defendant officer failed because officer did not arrest plaintiff, place him into custody, or sign a criminal complaint against plaintiff). To the extent York believes these claims should survive because Sarabia's testimony in the third grand jury session was "the factual predicate for York's Fourth Amendment claims for false arrest and unlawful detention regarding the murder charges[,]" that argument fails. "The fact that [ ] grand jury testimony caused the subsequent arrest is irrelevant [in this context], because testifying and arresting are two independent acts." *Juriss v. McGowan*, 957 F.2d 345, 348 (7th Cir. 1992). Thus, whether there was probable cause here matters not, for the false arrest and unlawful detention claims related to murder must be dismissed against Sarabia because he did not participate in those acts.

## 2. Malicious Prosecution

The malicious prosecution claim related to the murder charges must also be dismissed. When it comes to the commencement or continuation element of malicious prosecution, when brought against a police officer, "the chain of causation is only broken if the prosecutor's decision [to bring charges] is completely independent of any

action on the part of the individual whom the plaintiff is trying to hold liable." *Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (citing *Jones*, 856 F.2d at 993). Though Sarabia testified before the grand jury, York admits that ASA LaRue emailed Sarabia "stating criminal charges were going to be brought against York." (Pl. Resp. to Def. SOF ¶ 69.) This occurred before Sarabia went into the grand jury, suggesting that the decision to charge was already made prior to the testimony. (*Id.* (email on July 20, 2020); Def. Resp. to Pl. SOF ¶ 46 (grand jury proceedings on July 22, 2020)). Sarabia also had no contact with ASA LaRue other than when he was in front of the grand jury. (Pl. Resp. to Def. SOF ¶ 70.) Because the prosecutor's decision to charge was "completely independent" of any action Sarabia took, this breaks the causal link. *See Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) ("It is conceivable that a wrongful arrest could be the first step towards a malicious prosecution. However, the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutors.") (citations omitted). The motion with respect to the murder indictment malicious prosecution charge is granted.

In sum, as they relate to the Third Indictment, the defendants' motion for summary judgment on Counts I through III is granted.

## III.   QUALIFIED IMMUNITY

The defendants assert that Sarabia is also entitled to qualified immunity because it was "reasonable to believe that arguable probable cause to arrest York was present." (R. 80 at 12 (citing *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir.

2018)). "[T]he doctrine of qualified immunity 'shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Muhammad*, 900 F.3d at 903 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). It is the plaintiff's burden to overcome the invocation of qualified immunity; to do so, he must show that (1) "the official violated a statutory or constitutional right" and (2) "that the right was 'clearly established' at the time of the challenged conduct." *Id.* Qualified immunity is typically determined before trial, *Carroll v. Vill. of Homewood*, No. 97 C 2747, 2001 WL 1467708, at *8 (N.D. Ill. Nov. 15, 2001), and is a legal determination made by the Court, not a jury, *Payne v. Maher*, No. 11 C 6623, 2014 WL 625480, at *4 (N.D. Ill. Feb. 18, 2014).

Though this is not a jury question, the Court cannot resolve this issue prior to trial. *See id.* (declining to address qualified immunity prior to trial because finding revolved around fact disputes, and indicating willingness to address at trial if need be). As discussed, York has presented evidence to create a dispute as to whether there was probable cause to arrest him, detain him, and prosecute him for a violation of 625 ILCS 5-11/401. "In short, the same factual disputes that preclude a finding on summary judgment that there was probable cause likewise preclude entry of summary judgment based on qualified immunity." *Id.* Therefore, the motion for summary judgment on this basis is denied. Should the parties wish to raise this issue again at trial, the Court will entertain it.

19

## IV.   INDEMNIFICATION CLAIM

Finally, the defendants argue that because there are no underlying constitutional violations, York's indemnification claim fails. (R. 80 at 15.) Because the Court has not granted summary judgment on all claims, the indemnification claim survives. The motion for summary judgment on this ground is denied.

## CONCLUSION

For the reasons articulated in this Order, the defendants' motion for summary judgment [78] is granted in part and denied in part. Specifically, as it relates to the plaintiff's indictment for a violation of 625 ILCS 5-11/401, the motion as to Counts I through III is denied. As it relates to plaintiff's murder indictment, the motions as to Counts I through III is granted. The motion is further granted as to Count IV. The motion is denied as to Count V. The defendants' motion to strike the plaintiff's exhibits [100] is denied. The parties shall confer and file a status report by September 8, 2025, indicating the anticipated length of trial and their availability for trial starting December 1, 2025, December 8, 2025, or July 6, 2025.

Date: September 3, 2025

_____
JEREMY C. DANIEL
United States District Judge